In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 25-2307

ELMAR HOTEL MANAGEMENT, LLC, et al.,

*Plaintiffs-Appellants*,

*v.*

UNITE HERE LOCAL 1,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:24-cv-09808 — **Sunil R. Harjani**, *Judge*.

_____

ARGUED MAY 21, 2026 — DECIDED JULY 17, 2026

_____

Before KIRSCH, PRYOR, and MALDONADO, *Circuit Judges*.

MALDONADO, *Circuit Judge*. This case centers on an arbitration award (the "Award") entered against Elmar Hotel Management, LLC; Allegiant Equities, LLC; Social Club Management, LLC; and Remo Polselli (the "Employers"). An arbitrator found that the Employers violated a collective bargaining agreement (the "CBA") when they housed migrants at the Inn of Chicago without using UNITE HERE Local 1 (the "Union")

members to operate the facility. The district court confirmed the Award, and we affirm.

**I**

In March 2021, Remo Polselli, acting on behalf of Allegiant Equities, LLC ("Allegiant"), signed a purchase agreement for the Inn of Chicago (the "Inn"). At the time, the Inn was not operational, and its Union-represented employees were temporarily laid off because of the COVID-19 pandemic. The CBA, which had been signed by the Inn's prior operator, provided that the agreement would continue with any change in owner or operator. Consistent with that language, the purchase agreement provided that Allegiant could either enter a new CBA with the Union on substantially the same terms or assume the existing CBA. Allegiant then designated Elmar Hotel Management, LLC ("Elmar") as the operator of the Inn. And Hanna Karcho, Polselli's wife and Elmar's sole manager, signed an agreement with the Union, assuming the CBA. Despite its new ownership and newly designated operator, the Inn remained out of operation for the next couple of years.

In late 2022 or early 2023, the City of Chicago asked Polselli if the Inn could be used to house displaced migrants. Polselli (not Elmar as the operator) signed a Group Sales Agreement with ReloShare, Inc., a "hotel booking software for social service agencies," on behalf of the "Inn of Chicago" (not on behalf of Allegiant as the owner), agreeing to sell blocks of rooms to the City. In subsequent months, Polselli also signed three addenda to the agreement, increasing the number of rooms and nights. Per the agreement, functions that would ordinarily go to Union employees (e.g., housekeeping and food and beverage tasks) were assigned to an outside staffing agency. At some point, the arrangement with

that agency ended, and the functions were assigned to Social Club Management, LLC ("Social Club"), which Karcho also managed.

The Union soon caught wind that the Inn was back in operation without the use of Union employees. In March 2023, a Union representative visited the Inn, asked for information, and was told to leave and that the police had been called. Polselli later explained to the representative that an outside agency was cleaning the rooms, and a church was providing and serving the food. The Union filed grievances, alleging violations of the CBA. The grievances were addressed to Polselli and Karcho, as well as the Inn's designated point of contact for the Union, Raymond Crouse, and Polselli's financial management consultant, Michael Klein. Eventually, the grievances were submitted to arbitration. The Union also filed an unfair labor practice charge against Elmar and Allegiant (doing business as the Inn) with the National Labor Relations Board ("NLRB"). The NLRB charge was deferred to arbitration and consolidated with the resolution of the grievances.

Between November 2023 and January 2024, the arbitrator held two evidentiary hearings. Polselli, Karcho, and Crouse attended all or part of the hearings, represented by the same counsel; Polselli and Crouse testified, but Karcho did not, despite representations that she would. The arbitrator reviewed the parties' post-hearing briefs, and on July 20, 2024, he entered an Award for the Union, ordering the Employers to operate the Inn under the terms of the CBA, post notices about the violations, and provide compensatory relief.

Relevant to this appeal, the arbitrator made three decisions. First, he found that the Inn was operating as a "hotel" within the meaning of the CBA when it housed the migrants

(and, thus, the CBA was "applicable to these circumstances"). In making that determination, the arbitrator looked to the Group Sales Agreement. The arbitrator found that "nothing in the [agreement] remotely suggest[ed] the operation of the building wasn't still a hotel" and that "[i]t [wa]s more accurate to say that the building became a different type of hotel rather than saying it wasn't a hotel at all."

Second, the arbitrator found that there was "a single employer." He explained that Allegiant, Elmar, and Social Club "are practically speaking all parts of the same operation substantially under the personal control of Mr. Polselli as the Inn of Chicago." Put differently, "they were all fingers on the same hand." The arbitrator pointed out that Polselli signed the Group Sales Agreement on behalf of the Inn, signed three addenda to the agreement, and was involved in emails demonstrating significant coordination between all the entities—in short, Polselli was the "common thread that knit[ted] all this together." The arbitrator also considered that Karcho did not testify, and he drew an adverse inference from this fact given the prior representations that she would.

Third, the arbitrator found that the Employers violated the CBA and the National Labor Relations Act ("NLRA"). Specifically, he called out the Employers' failures to use Union employees, give notice to the Union, and bargain regarding the Inn's desire to transfer work to non-Union employees, as well as the removal of the Union representative from the property.

Displeased with the arbitrator's decision, the Employers turned to federal court. The district court confirmed the Award, and the Employers now appeal.

**II**

"When reviewing a district court's decision to confirm an arbitral award, we approach questions of law *de novo* and, to the extent there are any facts that are properly before us, we review them only for clear error." *Cont'l Cas. Co. v. Certain Underwriters at Lloyd's of London*, 10 F.4th 814, 819 (7th Cir. 2021) (citation omitted).

The Employers start by arguing that Allegiant, Polselli, and Social Club could not be bound by the arbitrator's decision because they did not agree to arbitrate—only Elmar did when Karcho signed the agreement to assume the CBA. This argument goes nowhere. To be sure, the general rule is that non-signatories to an arbitration agreement are not bound by the resulting decision, but where "a party willingly and without reservation allows an issue to be submitted to arbitration, he cannot await the outcome and then later argue that the arbitrator lacked authority to decide the matter." *AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir. 2000) (citation omitted); *see also Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 591 (7th Cir. 2001) (party could not "sit back and allow the arbitration to go forward" and then argue after the fact that it never agreed to arbitrate) (quotation omitted). And, true, a party can participate in arbitration and preserve its ability to later challenge the arbitrator's authority to bind it, but it must "clearly and explicitly reserve[] the right" to do so. *AGCO Corp.*, 216 F.3d at 593.

Here, the Employers participated in the arbitration without reserving the right to later object to arbitrability. They were all present for at least a portion of the arbitration hearings. And they all shared the same counsel, who characterized himself as the "Attorney for each Respondent" and never as-

serted that he was appearing solely on behalf of Elmar or that any subset of the Employers was objecting to arbitrability. *See Int'l Ass'n of Machinists & Aerospace Workers, Lodge No. 1777 v. Fansteel, Inc.*, 900 F.2d 1005, 1009 (7th Cir. 1990) (explaining that a party must "carefully and explicitly, in unambiguous language, ma[k]e known to the arbitrator and the union its clear intention that it [is] maintaining its objections to arbitrability even though it [is] agreeing to proceed with the arbitration hearing"). In short, with no evidence in this record that the Employers "questioned the arbitrator's authority" to resolve the dispute, they cannot now argue that he "had no authority" to bind them. *Jones Dairy Farm v. Local No. P-1236, United Food & Com. Workers Int'l Union*, 760 F.2d 173, 175 (7th Cir. 1985).

Second, the Employers argue that the arbitrator had no authority to find that any of them were the "Employer" as defined by the CBA or that the Inn was operating as a "hotel" when it was housing migrants. They insist that these determinations did not "draw[] [their] essence from" the CBA. *See United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). But they are again mistaken. When it comes to arbitral awards, "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." *Id.* Practically speaking, what this means is we "vacate only if there is 'no possible interpretive route' to the award" such that the arbitrator "must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract." *N. Ind. Pub. Serv. Co. v. United Steelworkers of Am.*, 243 F.3d 345, 347 (7th Cir. 2001) (quoting *Amax Coal Co. v. United Mine Workers of Am.*, 92 F.3d 571, 576 (7th Cir. 1996) (quotation omitted); *Am. Postal Workers Union v. Runyon*, 185 F.3d 832,

835 (7th Cir. 1999) (quotation omitted)). In fact, it does not matter whether the arbitrator "erred in interpreting the contract[,] . . . clearly erred in interpreting the contract[,] . . . [or] grossly erred in interpreting the contract"—all that matters is "whether they interpreted the contract." *U.S. Soccer Fed'n, Inc. v. U.S. Nat'l Soccer Team Players Ass'n*, 838 F.3d 826, 832 (7th Cir. 2016) (quotation omitted).

Here, the arbitrator's decision was rooted in the CBA and nowhere else. First, he agreed with the Employers that the CBA—which was replete with references to the building's operations as a "hotel"—would apply only if the Inn was still acting as a "hotel" when it was housing migrants. He determined it was. The arbitrator also reviewed the CBA's "broad definition" of "Employer"—which included "any person, firm, partnership, corporation, joint venture or other legal entity substantially under the control of the [Inn]"—and determined that Allegiant, Elmar, and Social Club were all "under the personal control of Mr. Polselli as the Inn of Chicago." Whether those conclusions were "correct" is wholly irrelevant to our analysis—we are satisfied that the arbitrator confined his inquiry to interpreting and applying the CBA.

Even assuming the arbitrator's inquiry strayed from the confines of the CBA, parties can "increase . . . the arbitrator's contractual authority by their express submission." *Am. Postal Workers Union*, 185 F.3d at 835 (quoting *Hill v. Staten Island Zoological Soc'y, Inc.*, 147 F.3d 209, 214 (2d Cir. 1998)). In other words, the scope of the arbitrator's authority can go beyond the agreement if the parties submit such issues to him. Here, the parties—including the Employers—argued extensively about whether the facts indicated that there was a "single employer" and about whether the Inn was operating as a "hotel,"

and the Employers never raised any concerns about whether the arbitrator had authority to answer those questions or otherwise objected to the issues being resolved by him. These questions were thus squarely presented to the arbitrator to resolve, and the Employers cannot now complain about his doing so.

Third, the Employers argue that the arbitrator had no authority to find that Polselli and Social Club violated the NLRA because the unfair labor practice charge that was submitted to the NLRB did not specifically name them as parties (the charge named only Elmar and Allegiant). But this is just another way of attacking the arbitrator's finding that they were all "Employers." And, to the extent that it is an argument that they lacked notice of the charge, that bleeds into their due process argument, addressed next.

The Employers attack the Award on due process grounds, arguing first that Allegiant, Polselli, and Social Club lacked notice of the grievances and the NLRB charge, so they were not aware of the potential for liability. This argument is quite a stretch. The grievances were addressed to Crouse (Polselli's designated point of contact for the Union), Polselli (who signed documents on behalf of Allegiant), Karcho (who signed on behalf of Elmar and managed Social Club), and Polselli's financial management consultant. The NLRB charge named Elmar and Allegiant, and listed Crouse and Polselli as representatives. And Polselli, Karcho, and Crouse showed up to the arbitration hearings with shared counsel, who actively argued on their behalf about who should be considered the "Employer." Polselli, Allegiant (via Polselli), and Social Club (via Karcho) were thus clearly on notice of the proceedings and of the possibility that liability might extend beyond only

Elmar. The Employers also argue that the arbitrator improperly shifted the burden of proof when he drew an adverse inference from Karcho's decision not to testify at the hearings. But the arbitrator did not rely solely on the adverse inference from Karcho's sudden decision not to testify—that was just one of many things he weighed in reaching his ultimate determination.

Last, the Employers argue that the Award violated public policy because the arbitrator "pierced the corporate veil" to hold Allegiant, Polselli, and Social Club liable even though they were not signatories to the CBA. But this is a rehash of the arguments that they did not accede to the arbitrator's authority and that the arbitrator had no authority to find them to be "Employers." As already explained, those arguments fail.

* * *

For the foregoing reasons, we AFFIRM.